## Richmond

### ROBERT H. BENNETT v. FIRST NATIONAL BANK OF NORFOLK.

March 5, 1973.

Record No. 8001.

Present, All the Justices.

*Grover C. Wright, Jr.* (*Caton & Wright,* on brief), for plaintiff in error.

*Frederick M. Quayle* (*Rixey & Rixey,* on brief), for defendant in error.

COCHRAN, J., delivered the opinion of the court.

First National Bank of Norfolk brought this action against Robert H. Bennett for $9,500, with interest, costs and attorney fees, for default in payment of a promissory note dated March 19, 1970, made by Bennett. As grounds of defense Bennett relied on want or failure of consideration, duress and fraud by the Bank in inducing him

to sign the note, and conditional or qualified delivery. The trial judge, sitting without a jury, found for the Bank and entered judgment in its favor against Bennett for the amount sued for. We granted Bennett a writ of error.

There is no material conflict in the evidence. It shows that in September, 1967, Mercury Mobile Homes, Inc., a closely held corporation, applied to the Bank for a $10,000 line of credit[1] to purchase inventory. By letter dated September 12, 1967, David Clark, IV, Vice President of the Bank, informed Mercury that the line of credit had been approved at an interest rate of 8%, that it must carry the personal endorsements of the principal stockholders and their wives, and that it would be reviewed at the end of the first year. Clark testified without contradiction that the extension of credit was to continue from year to year. Instead of requiring personal endorsements on Mercury notes the Bank obtained from Bennett and the two other principal stockholders, Thornton and Kozluk, and their wives, a separate "General Guaranty", dated November 1, 1967.[2]

The Bank's records show that during the first year loans made to Mercury under the line of credit and evidenced by several notes fluctuated in amount but never exceeded the $10,000 limit. The line of credit was renewed for a second year. On December 18, 1968, Mercury's note with an outstanding balance of $5,000 was replaced

---

[1] A "line of credit" is defined as:

"A margin or fixed limit of credit granted by one to another, to the full extent of which the latter may avail himself in his dealings with the former, but which he must not exceed; usually intended to cover a series of transactions, in which case, when the customer's line of credit is nearly or quite exhausted, he is expected to reduce his indebtedness by payments before drawing upon it further." *Black's Law Dictionary* 1078 (4th ed. 1951); *see also* 25 *Words and Phrases* 527 (Perm. ed. 1961).

"General Guaranty

[2] ". . . [T]he undersigned hereby jointly and severally unconditionally guarantee and agree to pay to First National Bank of Norfolk, Virginia, . . . all loans, drafts, overdrafts, accounts, checks, notes, interest, demands and liabilities, both direct and indirect, . . . now or hereafter owing to said Bank by Mercury Mobile Homes Inc. . . . it being expressly provided, however, that the total liability of the undersigned hereunder shall not exceed the sum of $10,000 (Ten Thousand & No/100 Dollars)".

\* \* \* \*

"This is a continuing guaranty and shall apply to all indebtedness and liabilities of said Principal Debtor [Mercury] to said Bank, heretofore or hereafter incurred or created and shall remain in full force and effect, . . . until written notice to the contrary . . . has been actually delivered to and filed with said Bank, but such notice shall not in any way affect the obligation of the undersigned hereunder in respect of all indebtedness and liabilities existing at the time said notice is received by the Bank . . . ."

by a new 30-day note of the corporation in the principal amount of $12,000. The $2,000 in excess of the limit under the line of credit was to be repaid in 30 days, and the balance was to be continued under the line of credit agreement *without curtailment requirements*. To secure the temporary $2,000 "overline" loan it was contemplated by the Bank that Bennett, Thornton and Kozluk, and their wives, would endorse the $12,000 note. Although only Thornton and Kozluk endorsed the note, the required $2,000 payment was made in reduction of principal on January 31, 1969. Thereafter the note, which specifically provided that payment of discount constituted a renewal for the period for which the discount was accepted, was so renewed each month for several months in the reduced principal amount of $10,000.

Bennett notified the Bank by letter dated February 7, 1969, that, as he had sold his interest in Mercury, he was terminating his personal guaranty of corporate indebtedness, although "this will only apply to indebtedness to the bank contracted for subsequent to your receipt of this letter." By letter of February 9, 1969, acknowledging receipt of the termination, Clark informed Bennett that Mercury owed the Bank $10,000 under its line of credit and that he was notifying the corporation that the Bank could not "make further advances under this line until we have had an opportunity to review the credit and restrengthen the line with something approximately equal to your net worth."

In May, 1969, the Bank, on advice of counsel, revised its note form to set forth the interest rate on the face of the note in order to be certain of compliance with a new regulation of the Federal Reserve Board. Over a period of several months, it undertook to replace each note in the Bank with a note executed on the revised form. By letter dated June 24, 1969, the Bank forwarded to Mercury for execution a 30-day note for $10,000 dated June 16, 1969, with interest at 8%, "to replace" the December 18, 1968 note carrying the same outstanding balance at the same interest rate "but which is on an outdated note form." The note on the revised form was executed on behalf of Mercury by Thornton, its president, and returned to the Bank, which thereupon stamped the December 18, 1968 note "Cancelled" and returned it to Mercury. Bennett was not notified of nor did he consent to this transaction.

On June 20, 1969, the Bank made an additional loan of $20,000 to Mercury, secured by stocks deposited as collateral.

By letter from Clark dated September 12, 1969, the Bank notified

Mercury, with copies directed to Bennett, Thornton and Kozluk, that it was terminating and declining to renew for a third year the $10,000 line of credit and demanded payment of the December 18, 1968 loan for $10,000 and the June 20, 1969 loan for $20,000. Several months later the $20,000 loan was paid. Efforts to collect the $10,000 loan were less successful.

After taking a 30-day personal note for $10,000 dated March 19, 1970, bearing 7¾% interest, executed by Bennett and Kozluk as comakers, the Bank assigned to them the "General Guaranty" and the June 16, 1969 Mercury note for $10,000. Bennett notified the Bank that he had executed the personal note for $10,000 to pay Mercury's December 18, 1968 note, and as that Mercury note was paid after he had revoked his guaranty, there was no consideration for the execution of his personal note to pay the June 16, 1969 Mercury note. He requested that the personal note be returned to him, refused to make payments thereunder and subsequently informed the Bank of his intention to file suit in equity to cancel the note for misrepresentation and lack of consideration. The Bank thereafter initiated this action against Bennett.

The trial court held that the June 16, 1969 note was a substitute or replacement for the December 18, 1968 note which did not create a new obligation and that "under all the facts and circumstances" the Bank was entitled to recover on Bennett's note of March 19,1970. The evidence supports this conclusion.

Each of the several Mercury notes executed during the first year, evidencing different loans under the line of credit, was assigned a different identifying number on the Bank's customer liability ledger sheet. The number given the note of December 18, 1968, was carried over to the note of June 16, 1969, evidencing the same loan. The December 18, 1968 note was renewed each month in the reduced principal amount of $10,000 until it was replaced by the June 16, 1969 note for $10,000, which in turn was renewed each month until it was replaced by the personal note of Bennett and Kozluk of March 19, 1970.

While not denying that his liability continued so long as the December 18, 1968 note remained outstanding, Bennett nevertheless insists that his guaranty was restricted to that one evidence of indebtedness. He argues that a substitution is a novation, and that the June 16, 1969 note was a renewal made without his consent after revocation of his guaranty. He relies on the general rule that the endorser or guarantor of a note is discharged by a renewal or extension

of payment made without his consent. *Cawley* v. *Hanes*, 173 Va. 381, 4 S.E.2d 376 (1939). But a guarantor will not be relieved of liability for renewals when it is contemplated by the parties that renewals will be made. *Cobb* v. *Vaughan & Co.*, 141 Va. 100, 110-11, 126 S.E. 77, 80-81 (1925). Here, the "General Guaranty" itself specifically applied to renewals and extensions. Moreover, the 30-day December 18, 1968 note provided for automatic renewal by payment of interest in advance. So there can be no doubt that the parties contemplated and intended that the guaranty would apply to renewals.

Bennett's guaranty by its terms applied to corporate indebtedness not exceeding $10,000 rather than to one specific note. Where the intent of a guarantor is to guarantee any indebtedness of the principal up to a stated maximum it does not matter how the debt is evidenced. *See Gordon* v. *State Nat'l Bank*, 249 Md. 378, 239 A.2d 915 (1968).

There is a split of authorities as to whether a guaranty, after revocation, covers renewals of claims within coverage at the time of revocation. Annot., 100 A.L.R. 1236 (1936). Although some courts hold that renewal of a note following revocation releases the guarantor, others have reached the opposite result after ascertaining the purpose of the guaranty contract and the intent of the parties. In *Corn Exchange Bank Trust Co.* v. *Gifford*, 268 N.Y. 153, 197 N.E. 178 (1935), it was held that the guaranty included renewals of notes evidencing indebtedness existing at the time of revocation. That court and others have distinguished an agreement which guarantees a loan or an amount of indebtedness from one which guarantees payment of an evidence of indebtedness, holding that the former covers renewals after revocation but that the latter does not. *Fewox* v. *Tallahassee Bank & Trust Co.*, 249 So.2d 55, 58 (Fla. App.), *cert. denied*, 252 So.2d 799 (1971); *Exchange Nat'l Bank* v. *Hunt*, 75 Wash. 513, 517, 135 P. 224, 225 (1913). We conclude that this is a valid distinction.

Bennett has never contended that the monthly renewals of the December 18, 1968 note after revocation of his guaranty released him from liability. He has consistently maintained only that cancellation of that note upon execution of the June 16, 1969 note discharged him. Citing Code § 8.3-605,[3] he argues that the Bank could

---

[3] "§ **8.3-605. Cancellation and renunciation.**—(1) The holder of an instrument may even without consideration discharge any party

(a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or

not have recovered from Mercury or from him on the December 18, 1968 note after it was cancelled and returned to Mercury. But Bennett's liability as guarantor was not limited to that one evidence of indebtedness.

The wording of the guaranty, the circumstances under which it was executed, and the constructon placed upon it by the parties show that Bennett was liable for renewals of the December 18, 1968 note until September, 1969, the end of the year for which the line of credit extended, provided no additional advances were made under the line without his consent. Replacement of the December 18, 1968 note with the June 16, 1969 note was, at most, merely renewal in another form, a change in the evidence of indebtedness but not an increase or other change in the indebtedness itself. Hence, the trial court did not err in finding that the June 16, 1969 note created no new Mercury indebtedness.

Bennett's argument that the Bank's failure to sue him on the guaranty shows that the Bank knew that the guaranty had been discharged is untenable. The evidence is uncontradicted that the Bank, as a convenience to him, permitted Bennett to give his personal note at a lower rate of interest than the rate paid by Mercury instead of requiring him to pay at once the full amount of his liability under the guaranty.

The $20,000 loan to Mercury secured by other collateral did not affect Bennett's guaranty. If a guaranty is conditioned on the principal incurring a total indebtedness not exceeding a specified amount, then the guarantor is discharged if the limit is exceeded. *Schluderberg-Kurdle Co. v. Trice*, 198 Va. 85, 92 S.E.2d 374 (1956). The unconditional Bennett guaranty, however, can fairly be construed only to limit Bennett's liability to $10,000, but not to discharge him when total Mercury indebtedness exceeded that amount. *See* Annot., 57 A.L.R. 2d 1209, 1212 (1958); 38 Am. Jur. 2d *Guaranty* § 21, 1019-20 (1968).

We find no merit in Bennett's argument that the trial court failed to consider his grounds of defense. In finding for the Bank on the personal note the court necessarily rejected by implication the defenses which Bennett strenuously asserted at trial.

■ When Bennett executed and delivered to the Bank his personal note for $10,000, he was liable for Mercury indebtedness in that amount. So there was no failure or lack of consideration.

mutilation, or by striking out the party's signature; or

(b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged."

* * * *

While Bennett may have believed that the December 18, 1968 note was still outstanding when he gave his personal note, the mistake does not enable him to escape liability. As Bennett was liable for the June 16, 1969 note, he will not be permitted to say that delivery of his personal note was conditioned on receipt by him of the December 18, 1968 note which the June 16, 1969 note replaced.

Nor does the record support his other defenses. When the Bank refused to renew the Mercury line of credit for a third year it demanded payment of the December 18, 1968 *loan*, not the cancelled December 18, 1968 *note* or the outstanding June 16, 1969 *note* evidencing the same indebtedness. This demand, though imprecisely worded, was consistent with the Bank's records and other evidence and falls short of duress, fraud or misrepresentation.

*Affirmed.*