**PETRA INTERNATIONAL BANKING CORP., Plaintiff,**

v.

**FIRST AMERICAN BANK OF VIRGINIA, et al., Defendants.**

**Civ. A. No. 90–829–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 1, 1991.

---

**10.** *Ibid.*

**11.** Affidavit of Warden Garraghty.

**12.** *Ibid.*

Charles Douglas Welty, Arlington, Va., for Petra Intern. Banking Corp.

John Anderson, Alexandria, Va., for First American Bank of Virginia.

Brien A. Roche, McLean, Va., for Dameron Intern., Inc., Richard E. Pitts, Marga K. Pitts, James Pitts and Nancy Pitts.

## MEMORANDUM OPINION

ELLIS, District Judge.

This dispute grows out of the use of two documentary letters of credit to finance the purchase of T-shirts by a Virginia corporation from the manufacturer in Amman, Jordan. In essence, following the delivery of poor quality T-shirts, the purchaser refused to pay the issuing bank, and the issuing bank then refused to pay the confirming bank, which had honored drafts drawn under the letters of credit. The purchaser and the issuing bank rely on their receipt of technically nonconforming documents under the letters as grounds for nonpayment. The purchaser and the manufacturer settled their dispute over the poor quality T-shirts, but the remaining parties were not able to resolve their differences. Thus, here the confirming bank seeks recovery against the issuing bank and the purchaser for payments it made under the letters of credit, and the issuing bank seeks recovery against the purchaser for any sums it must pay to the confirming bank.

Before the Court are cross-motions for summary judgment. The motions raise, *inter alia*, the seldom litigated issue of what remedy an account customer has when an issuing bank inadvertently accepts nonconforming documents under a letter of credit.

All material facts are undisputed. These facts, the terms of the letters of credit, other relevant contractual agreements, and existing law require that defendant First American Bank, the issuer of the letters, reimburse the confirming bank for payments made under the letters, and that First American Bank's account customer, the purchaser of the T-shirts, reimburse First American. Both First American and the purchaser, by failing to object to documentary inconsistencies in timely fashion, have waived their right to do so. All other issues raised in this case with the exception of costs and attorney's fees are also disposed of on summary judgment.

### Facts

In 1987 Dameron International, Inc., a Virginia corporation ("Dameron"), purchased T-shirts from National Marketing–Export Co. ("National Marketing") of Amman, Jordan. To facilitate the transaction, Dameron sought issuance of two letters of credit by First American Bank of Virginia ("First American"). To this end, Dameron executed two documents, each entitled Application and Agreement for International Commercial Letter of Credit ("the Agreements"), and signed two commercial notes, each in the amount of $135,000.00, to secure the letters of credit. Richard Pitts, the president of Dameron, and his wife, son, and daughter-in-law, executed continuing guaranties to further secure any debts of Dameron owed to First American.[1] First American issued its Irrevocable Letters of Credit Nos. I–629 and I–630 ("the Letters"), each for $135,000, on December 17, 1987. The Letters stated that they were issued "in favor of National Marketing–Export Co.," of Amman, Jordan and "for the account of Dameron Intl., Inc." of McLean, Virginia. The Letters authorized drafts to be drawn on First American within thirty days of submission to First American of specific, listed documents. At the request of National Marketing and National's bank in Jordan, Petra Bank, the Letters were amended on December 22, 1987, to provide that drafts under the Letters

---

1. First American's Trial Exhibits [hereinafter FABV], Exh. Nos. 1, 2, 5–8.

could be drawn directly on Petra International Banking Corporation of Washington, D.C. ("PIBC"), Petra's American affiliate. In the vernacular of letters of credit transactions, PIBC became a "confirming bank," First American an "issuing bank," Dameron the "account customer," and National Marketing the "beneficiary" of the Letters.

When initially issued, the Letters required that an "inspection certificate from [an] independent inspector certifying number and quality of pieces per sample" of the T-shirts be among the documents presented for payment. This provision subsequently was amended to require both a certificate from a specific independent inspection company and a "statement by the beneficiary," National Marketing, attesting to the quality of the T-shirts.[2]

Dameron received several T-shirt shipments from National Marketing in 1988. Several corresponding payments were made under the Letters by PIBC to National Marketing. In late September 1988, another shipment was begun and National Marketing made a demand for payment under the Letters. This demand was relayed from Petra Bank in Amman to PIBC as two documentary time drafts drawn against the Letters in the aggregate amount of $95,904. PIBC sent a telex to First American on October 7, 1988, noting certain discrepancies between the documents submitted and those required by the Letters, including the fact that the certificate from the independent inspection company was missing. First American forwarded PIBC's telex to Dameron, which waived the discrepancies listed by PIBC on condition that the drafts were drawn 150

days from the date of the bill of lading, i.e., from the date of shipment.[3] First American sent a telex message to PIBC on October 19, 1988, stating "ACCOUNT PARTY HAS WAIVED ALL DISCREPANCIES PROVIDED DRAFTS ARE DRAWN AT 150 DAYS BILL OF LADING." [4] First American sent a second telex message on October 24, 1988, stating in relevant part: "DISCREPANCIES HAVE BEEN WAIVED BY A/P [i.e., Dameron]. PLEASE ACCEPT DRAFT AND FORWARD DOCS TO US." [5] Between receipt of the first and second telexes, on October 21, 1988, PIBC discounted and accepted the documentary time drafts.[6] On October 25, 1988, PIBC sent a telex to First American that confirmed receipt of First American's telex of October 24th, informed First American that the drafts had been accepted with the proviso that they be drawn 150 days from the date of the bill of lading, i.e., on February 21, 1989, and transmitted the documents to First American.[7] First American forwarded the documents to Dameron shortly after receiving them. Dameron kept the documents and took possession of the T-shirts. On November 16, 1988, First American sent an acknowledgement letter to PIBC stating that the documentary drafts for $95,904 were "accepted and, at maturity, we will remit proceeds according to your cover letter." [8]

Dameron was dissatisfied with the quality of the T-shirts received from National Marketing. It undertook negotiations with National concerning the $95,904 payment. As the February 21, 1989 deadline for drawing on the time drafts approached,

**2.** By telex First American directed PIBC to Delete inspection certificate from independent inspector and include "inspection certificate from SGS that goods being shipped are of the quality of the samples provided to and accepted by Dameron and are of the number and colors specified in the order." Same statement must be presented by the Beneficiary too. FABV, Exh. No. 14.

**3.** FABV Exh. No. 38.

**4.** Plaintiff's Memorandum Brief in Support of Motion for Partial Summary Judgment, Exh. No. 7.

**5.** *Id.* at Exh. No. 8.

**6.** *Id.* at Exh. No. 9.

**7.** *Id.* at Exh. No. 10, stating in relevant part: "WE NEGOTIATED DOCUMENTS UNDER THE ABOVE L/C. DRAFT FOR USD 95,904.00 WAS ACCEPTED BY US TO MATURE ON FEBRUARY 21, 1989 (DRAWN AT 150 DAYS BILL OF LADING)."

**8.** FABV, Exh. No. 43.

Dameron requested that First American obtain an extension of payment. First American then sent a telex to PIBC requesting an extension to May 21, 1989. The telex stated that National Marketing had agreed to this delay in receiving payment.[9] PIBC informed First American that it would delay and refinance the payment provided that First American pay interest during the delay at the prime rate plus two percent. Dameron and First American agreed.[10] As the new May 21, 1989 deadline drew near, Dameron requested that First American seek an additional extension of thirty days. First American requested the extension, explaining that "SPECIAL ARRANGEMENTS REGARDING THESE PAYMENTS WERE MADE BY BUYERS AND SELLERS ALLOWING THE 30 DAY EXTENSION."[11] PIBC agreed to this second extension on the condition that it continue to receive interest at prime plus two percent, and First American and Dameron accepted this requirement.[12]

In June or July, 1989, Richard Pitts informed First American that Dameron did not want to pay National Marketing because of the poor quality of the T-shirts. William von Berg of First American informed Pitts that First American would be obligated to pay under the Letters unless the bank were sued by Dameron and enjoined from doing so. While the parties are uncertain as to when this conversation occurred, it is clear that in late June, when Dameron requested a third extension, Dameron and National Marketing continued to be hopeful that they could settle their differences concerning the $95,904. Dameron planned to obtain additional T-shirts of suitable quality from National at a reduced price, and it so informed First American.[13]

On June 20, 1989, Richard Pitts requested that First American seek a third extension. On the same day, Bassem Farouki, the principal of National Marketing, informed PIBC that Dameron would be requesting an additional thirty-day extension.[14] Although PIBC initially took the position that First American should finance Dameron, it eventually agreed to an extension to July 21, 1989, under the same interest payment conditions as were attached to the previous two extensions.[15]

Dameron's negotiations with National Marketing did not bear fruit. On July 20, 1989, Dameron obtained an Order of Attachment from the Fairfax County Circuit Court, directing First American not to pay PIBC under the Letters. First American claims that it did not immediately learn of the existence of the writ. Nevertheless, First American did not pay PIBC on July 21, 1989. Rather, on that day, at Dameron's request, First American requested an extension of payment to the following week. PIBC responded by demanding payment. Payment was not made. Instead, on July 28th, First American informed PIBC that it had been enjoined by the Fairfax County Circuit Court from making payments under the Letters until further notice.[16]

From July 20, 1989 until April 13, 1990, Dameron pursued a law suit against National Marketing in the Fairfax County Circuit Court. In the course of this litigation, and more than one year after its receipt of the documents, Dameron noticed and then informed First American that the "Statement of the Beneficiary" was not among the documents that First American forwarded pertaining to the $95,904 shipment.

**9.** Plaintiff's Memorandum Brief in Support of Motion for Partial Summary Judgment, Exh. No. 11.

**10.** *Id.* at Exh. Nos. 12 & 13; FABV Exh. Nos. 46 & 48.

**11.** *Id.* at Exh. No. 14.

**12.** *Id.* at Exh. Nos. 15 & 16.

**13.** FABV Exh. No. 59.

**14.** FABV Exh. Nos. 59 & 60.

**15.** FABV Exh. Nos. 60, 61, 64, 66; Plaintiff's Memorandum Brief in Support of Motion for Partial Summary Judgment, Exh. Nos. 17 & 18.

**16.** Plaintiff's Memorandum Brief in Support of Motion for Partial Summary Judgment, Exh. Nos. 19 & 20. First American apparently received a copy of the Order of Attachment on July 28, 1989, although it was not served with the Order until August 1, 1989. *See Id.* at Exh. Nos. 20 & 21.

First American informed Dameron that it had forwarded all documents it had received. The absence of the Statement of the Beneficiary from the documents was not noted as a discrepancy by PIBC or First American when each had examined the documents. Both Dameron and First American agree that the Statement of the Beneficiary was never among the documents presented by National Marketing to PIBC,[17] and that PIBC, First American, and Dameron each inadvertently failed to notice the missing Statement of the Beneficiary when each received the documents.[18]

Dameron and National Marketing eventually settled their suit. Dameron kept the T-shirts, but received an undisclosed amount of cash from National Marketing related, it appears, to the shipment here at issue and to other shipments and disputes between the parties. The precise terms of the settlement remain confidential and have not been disclosed to the Court. On April 13, 1990, the Fairfax County Circuit Court vacated the Order of Attachment.[19] On the same day, PIBC requested payment from First American of $95,904 of principal and $14,079.24 of interest.[20] First American has refused to make the payment, relying primarily on PIBC's alleged failure to note the missing Statement of the Beneficiary. Dameron, in turn, has refused to reimburse First American if payment is made under the Letters, despite having signed the Agreements and commercial notes, kept the documents accompanying the relevant drafts, taken possession of the T-shirts, and recovered settlement compensation from National Marketing. The Pitts, in turn, have refused First American's demands for reimbursement under the Continuing Guarantees.

*Proceedings*

PIBC's Complaint contains seven counts[21] against six defendants.[22] The

---

**17.** PIBC contends that the Statement of the Beneficiary was among the documents that it examined and forwarded to First American, although its only evidence for this is its claim that if the statement had been missing, its employees would have noticed and remarked on this discrepancy. First American and Dameron contend that the statement was absent from the documents sent by PIBC. There is a dispute among the parties, then, as to whether the statement was missing. Because the Court finds that First American must reimburse PIBC even if the statement was missing, this disputed fact is not material.

**18.** Dameron maintains that it believed First American had forwarded only those documents necessary for Dameron to take possession of the T-shirts, and that the bank had kept all other documents in its files. This is consistent with Dameron's contention that it had no independent duty to inspect the documents and instead could rely on First American to determine whether the documents conformed to the Letters. From the record it is not clear whether Dameron noticed the absence of the statement immediately upon receipt of the documents but assumed that First American had retained it, or inadvertently failed to note the statement's absence until caught in the throes of litigation with National Marketing. Which of these occurred is irrelevant to the dispute at bar because the Court finds that Dameron had an independent duty to inspect the documents upon their receipt.

**19.** *Id.* at Exh. No. 22.

**20.** *Id.* at Exh. No. 23.

**21.** The seven counts are captioned as follows:
COUNT I—WRONGFUL DISHONOR [OF THE LETTERS]—AGAINST FIRST AMERICAN,
COUNT II—WRONGFUL DISHONOR—AGAINST DAMERON,
COUNT III—WRONGFUL DISHONOR—AGAINST RICHARD PITTS, MARGA PITTS, JAMES PITTS, AND NANCY PITTS,
COUNT IV—FRAUD—AGAINST FIRST AMERICAN,
COUNT V—FRAUD—AGAINST FIRST AMERICAN,
COUNT VI—COMBINATION TO INJURE PIBC IN ITS BUSINESS—AGAINST FIRST AMERICAN, DAMERON, AND RICHARD PITTS, and
COUNT VII—BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING—AGAINST FIRST AMERICAN.

**22.** The six defendants are First American, a Virginia corporation, Dameron, also a Virginia corporation, Richard and Marga Pitts, husband and wife and citizens of Virginia, and James and Nancy Pitts, husband and wife and citizens of New Jersey. As PIBC is incorporated in the District of Columbia, there is complete diversity of citizenship among the parties. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 666–67 (4th Cir.1989). The amount at issue exceeds $50,000. Hence, jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1).

Court dismissed Count III, pursuant to Rule 12(b)(6), Fed.R.Civ.P., on July 13, 1990.[23] Dameron subsequently filed a Motion for Summary Judgment claiming that the prior proceeding between Dameron and National Marketing in the Fairfax County Circuit Court barred the instant case under principles of res judicata. That motion was denied.[24]

PIBC then filed a motion for summary judgment on Count I of its Complaint, which alleges that First American Bank wrongfully dishonored the drafts under the Letters. Dameron and Richard Pitts filed a motion for summary judgment as to Counts II and VI of PIBC's Complaint. The same parties also filed a motion for summary judgment on a cross-claim against First American. First American, in turn, moved for summary judgment on Counts I, IV, V, and VII of PIBC's Complaint, joined in Dameron's and Richard Pitts' motion for summary judgment on Count VI, and moved for summary judgment on its own cross claim against Dameron and the Pitts in the event it is found liable to PIBC. Hearings were held on these motions, and they are now ripe for disposition.

### Analysis

Summary judgment standards are well settled. The moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; *Davis v. Thoman Motel Corp.*, 900 F.2d 28, 31 (4th Cir.1990); *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990); *De Leon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 (4th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989). "Such a burden may be met by use of 'affidavits, exhibits, depositions, and other discovery materials.'" *Pachaly*, 897 F.2d at 725, quoting *Barwick v. Celotex Corp.*, 736

F.2d 946, 958 (4th Cir.1984). The party opposing summary judgment is entitled to have the evidence of record and all reasonable inferences read in its favor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Pachaly*, 897 F.2d at 725 n. 3. But, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

Actions pertaining to letters of credit are particularly "well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents." *Banque Worms v. Banque Commerciale Privee*, 679 F.Supp. 1173, 1178 (S.D.N.Y.), *aff'd*, 849 F.2d 787 (2d Cir.1988); *see Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1537 (S.D.N.Y.1985), *aff'd*, 808 F.2d 209 (2d Cir.1986). Below, the Court first analyzes and grants PIBC's motion for summary judgment as to First American's obligation to pay PIBC for drafts submitted under the Letters. Next, PIBC's claim that it may also hold First American's account customer, Dameron, liable for the amount of the drafts is dismissed. Having held First American liable to pay PIBC, the Court then concludes that Dameron and the Pitts are obligated to reimburse First American for amounts paid to PIBC under the Letters. Finally, the Court dismisses PIBC's claims of fraud and breach of good faith and fair dealing against First American and PIBC's claim of

---

**23.** *Petra International Banking Corp. v. First American Bank of Virginia,* Civ. No. 90–829–A (E.D.Va. July 13, 1990) (finding that guaranties were not consideration for PIBC's confirmation of Letters and that there was no basis in law or fact to support claim that PIBC was subrogated to rights of First American under the guaranties).

**24.** *Petra International Banking Corp. v. First American Bank of Virginia,* Civ. No. 90–829–A (E.D.Va. August 28, 1990).

conspiracy to injure its business against First American, Dameron, and Richard Pitts.

## I. *First American's Obligation to Pay PIBC*

▮ PIBC requests summary judgment on Count I of its Complaint, which alleges that First American wrongfully refused to honor the Letters and pay the $95,904 plus interest to PIBC. First American contends that PIBC's failure to note the missing Statement of the Beneficiary relieves it of any obligation to honor the drafts drawn under the Letters. The threshold issue is the choice of governing law. The Letters state on their face that they are to be governed by the Uniform Customs and Practices for Documentary Credits (1983 Revision), International Chamber of Commerce Publication No. 400 ("the UCP"). Given this, the Court finds that the UCP should be applied in this case.[25] Neither PIBC nor First American objects to application of the UCP, though they differ in interpreting its provisions.

▮ The pertinent UCP provision is Article 16, which states that if an issuing bank desires to "refuse documents," it must do so "without delay" by stating the discrepancies it has found and "holding the documents at the disposal of, or ... returning them to, the presentor (remitting bank or the beneficiary, as the case may be)." If the issuing bank fails to perform these requirements, it "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit."[26] Numerous courts have

25. Some state statutes specifically provide that parties may choose the UCP as the law governing a letter of credit and thereby avoid application of the state's version of the Uniform Commercial Code ("UCC"). *See, e.g., KMW International v. Chase Manhattan Bank,* 606 F.2d 10, 15 n. 3 (2d Cir.1979) (discussing New York's UCC § 5–102(4)). No such express provision exists in Virginia law. Yet, application of the UCP is proper here, for two reasons. First, under Virginia law, "the proper law of a contract is the intent of the parties ... whether express or implied ... except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law." *Tate v. Hain,* 181 Va. 402, 25 S.E.2d 321, 323–24 (1943); *see Hooper v. Musolino,* 234 Va. 558, 364 S.E.2d 207, 211, *cert. denied,* 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 47 (1988) (enforcing contractual choice of law clause selecting North Carolina law because that state's law was "reasonably related to the purpose of the agreement"); *C.I.T. Corp. v. Guy,* 170 Va. 16, 22, 195 S.E. 659, 661 (1938) ("[t]he nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties"); *see also Bryant Elec. Co. v. City of Fredericksburg,* 762 F.2d 1192, 1196 (4th Cir.1985) (forum selection clauses are enforceable under Virginia law). Virginia courts would, therefore, uphold the parties' explicit choice of the UCP, rather than the UCC, as the governing law here. Second, Virginia's UCC points to the application of the UCP in this case. Virginia Code § 8.5–102(3) invites the application of "rules and concepts of letters of credit" developed outside Virginia's UCC to "a situation not provided for" by Virginia's UCC. Section 8.5–112 comes closest to the "situation" of this case. This section notes that a bank has a duty to return documents when it is dishonoring a draft. But the section fails to specify whether an issuing bank that initially accepts a draft is subsequently precluded from rejecting it based on documentary discrepancies. Because § 8.5–112 fails to specify what should occur in this case, it is appropriate, given § 8.5–102(3), to supplement § 8.5–112 with the rules of the UCP, particularly since the parties themselves chose the UCP. Hence, the UCP should apply, either because the parties selected it and their choice would be respected by Virginia's courts, or because the Virginia UCC invites its application.

26. The full text of Article 16 of the UCP is as follows:

(a) If a bank so authorized effects payment, or *incurs a deferred payment undertaking,* or accepts or negotiates *against documents which appear on their face to be in accordance with the terms and conditions of a credit,* the party giving such authority *shall be bound* to reimburse the bank which has effected payment, or incurred a deferred payment undertaking, or has accepted or negotiated, and *to take up the documents.*

(b) If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, *it must determine, on the basis of the documents alone, whether to take up such documents, or to refuse them* and claim that they appear on their face not to be in accordance with the terms and conditions of the credit.

(c) The issuing bank shall have *a reasonable time* in which to examine the documents and to determine as above whether to take up the documents or to refuse the documents.

held that Article 16 and its predecessor, Article 8 of the 1974 UCP, preclude an issuing bank from asserting the noncompliance of documents presented by a beneficiary where the bank delays in raising this claim.[27] *Bank of Cochin v. Manufacturers Hanover Trust Co.*, 808 F.2d 209 (2d Cir.1986), a case precisely on point, presents a striking example of this principle in operation between an issuing and a confirming bank. There, the issuing bank, on the very day of its receipt of a documentary draft from the confirming bank, telexed its intention to dishonor the draft. But the issuing bank did not supply the confirming bank with a reason for the dishonor until twelve-to-thirteen-days later. This delay, the Court found, violated Article 8(d)'s command that an issuing bank intending to dishonor a documentary draft "notify [the confirming bank] 'expeditiously' and 'without delay' of specific defects and of the disposition of the documents, and ... precluded [the issuing bank] from asserting noncompliance...." *Id.* at 213. The same result should obtain here because the issuing bank's notice was delayed even longer than in *Bank of Cochin.* In the instant case, First American received the documents on or about October 25, 1988. Not only did it fail to note any discrepancies or to hold the documents at PIBC's disposal, it transferred the documents to its account customer and formally notified PIBC on November 16, 1988 that "the transaction was accepted and, at maturity, we will remit proceeds...." [28] First American did not mention any discrepancies to PIBC until more than one year after receipt of the documents. In the interim, it made several promises to pay in exchange for extensions of time. First American is therefore precluded by Article 16 from asserting noncompliance.

First American seeks to avoid application of Article 16 by arguing that Article 16 applies to drafts passing from beneficiaries or advising banks to issuing banks, but not to drafts passing from confirming banks to issuing banks. In support, First American points to Virginia Code § 8.5–107(2), which states that a confirming bank "becomes directly obligated on the credit to the extent of its confirmation, *as though it were its issuer* and acquires the rights of an issuer." (Emphasis added.) From this, First American argues that it should be viewed as PIBC's account customer in the transaction at issue, while PIBC should be deemed to be the issuing bank subject to

(d) *If the issuing bank decides to refuse the documents, it must give notice to that effect without delay* by telecommunication or, if that is not possible, by other expeditious means, to the bank from which it received the documents (the remitting bank), or to the beneficiary, if it received the documents directly from him. *Such notice must state the discrepancies* in respect of which the issuing bank refuses the documents *and must also state whether it is holding the documents at the disposal of, or is returning them to, the presentor* (remitting bank or the beneficiary, as the case may be). The issuing bank shall then be entitled to claim from the remitting bank any refund of any reimbursement which may have been made to that bank.

(e) *If the issuing bank fails* to act in accordance with the provisions of paragraphs (c) and (d) of this article and/or fails *to hold the documents at the disposal of,* or to return them to, *the presentor, the issuing bank shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit.*

(Emphasis added.)

27. *See, e.g., Kerr–McGee Chemical Corp. v. FDIC,* 872 F.2d 971, 973 (11th Cir.1989) (Article 16(e) "makes plain that a bank will be estopped from subsequent reliance on a ground for dishonor if it did not specify that ground in its initial dishonor"); *Esso Petroleum Canada v. Security Pacific Bank,* 710 F.Supp. 275 (D.Or.1989) (where bank informed beneficiary that it was dishonoring documentary draft on the day the draft was presented, but did not specify reasons therefore until three days later, bank violated Article 16(d)'s command that reasons for dishonor be given at time of dishonor and was precluded by Article 16(e) from later raising valid discrepancies); *Datapoint Corp. v. M & I Bank of Hilldale,* 665 F.Supp. 722, 727 (W.D.Wis.1987) (bank's use of mails rather than telecommunication to dishonor draft on day draft received violated Article 16(d)'s requirement of notification "without delay"); *accord* H. Harfield, *Bank Credits & Acceptances* 232 (5th ed.1974); Dolan, *Strict Compliance with Letters of Credit: Striking a Fair Balance,* 102 Banking L.J. 18, 31 (1985) (describing Art. 16(e) as a "strict estoppel" or "preclusion" rule).

28. FABV Exh. No. 43.

Article 16.[29] It is true that PIBC, upon becoming a confirming bank, has the rights and duties of an issuing bank and is therefore subject to Article 16. It is also true that First American may be viewed as PIBC's customer. Even so, neither of these points changes First American's status as an issuing bank nor relieves it from its Article 16 duties. In short, as one or more confirming banks are inserted in the chain between the original issuing bank and the·beneficiary, each bank, including the original issuer, is an issuing bank subject to Article 16. This conclusion finds support in the language of Article 16 and makes good commercial sense. On its face, Article 16 uses broad language, the plain meaning of which covers documentary draft transfers between confirming and issuing banks.[30] Sensible policy considerations support this construction. To hold otherwise and accept First American's reading of Article 16 would render the UCP devoid of standards governing transactions between confirming and issuing banks. This would make no business sense.[31] For similar reasons, the Court rejects First American's odd claim that PIBC's acceptance of the documentary drafts before First American had received and reviewed the documents should absolve First American of its obligation to honor the draft.[32]

**29.** *See also* Va.Code § 8.5–103(1)(g), stating "A *'customer'* is a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer."

**30.** Section 16(a)'s reference to "a bank ... [that] incurs a deferred payment undertaking" indicates that Article 16 uses the word "bank" to refer to confirming banks as well as merely banks that advise a beneficiary of the issuance of a letter of credit and accept documents for transmission to issuing banks. Section 16(d) states: "If the issuing bank decides to refuse the documents, it must give notice to ... *the bank from which it received the documents (the remitting bank),* or to the beneficiary, if it received the documents directly from him...." (Emphasis added.) This indicates that Section 16 uses the term "remitting bank" as a general term to cover any bank from which an issuing bank receives a documentary credit, including a confirming bank.

First American argues that the term "remitting bank" as used in Article 16 refers only to an advising bank, *i.e.,* a bank requested by the issuing bank to "advise" a beneficiary of the existence and terms of a letter of credit, but not to obligate itself to honor drafts under the letter. The UCP, however, uses the specific term "advising bank" when it desires to refer to such banks. *See, e.g.,* Article 12(a) & (d). Hence, the term "remitting bank" in Article 16 is a general term that includes both advising and confirming banks.

**31.** *Article 16 of the UCP reflects commercial practices and the rules developed in the preceding common law of letters of credit. Article 16, when interpreted according to the plain meaning of its terms, adequately provides for the insertion of one or more confirming banks between the issuing bank and the beneficiary. As each bank, including the issuer, receives a documentary draft, it must reject it "expeditiously" if it finds inconsistencies. It must then hold the documents at the disposal of the prior holder in the chain, or be bound to pay the draft and keep the documents. If the documentary draft is dishonored by one party, the preceding party, who has already bound itself to pay the draft by not itself rejecting the draft in timely fashion, is still bound to honor the draft. The preceding party nevertheless receives the documents, and hence has a claim on the goods underlying the transaction, which it can use to compensate itself for having paid for the goods. See H. Harfield, Bank Credits and Acceptances 105 (5th ed. 1974) ("bank's loss will be the amount of the payment ... less any amount which it may realize from disposition of the documents"). First American's reading of Article 16 would leave the confirming bank obligated to pay the draft but without the documents, while the issuing bank or its customer would receive the documents and goods without paying for them.*

**32.** Under the scheme of Article 16, it appears that a confirming bank becomes obligated to pay a documentary credit when it transfers documents on to the issuing bank. The confirming bank may, if it finds discrepancies, dishonor a documentary draft and return the documents to the beneficiary or to a prior confirming or advising bank in the chain of transfer. The confirming bank, like the issuing bank, appears to be required to accept or reject the documents "on the basis of the documents alone." Article 16(b). It is not permitted to pass them on perfunctorily to the issuing bank to obtain that bank's opinion on the documents' compliance with the letter of credit. If it could so operate, it would be no more than an advising bank. Furthermore, First American can claim no harm from PIBC's acceptance of the draft before First American received the documents. Under Article 16, First American was still entitled to review the documents upon receipt and to reject and return them as nonconforming to PIBC. (Although it is not relevant, First American appears to have been aware of this, for it

Finally, even if the Court were to find that First American should be treated as a "customer" of PIBC, First American would still be liable for the reasons given below in Part III for holding Dameron liable to reimburse First American.

## II. *PIBC Cannot Recover Directly From Dameron*

In Count II of its Complaint PIBC seeks to hold Dameron, the account customer, liable for the amount of the drafts plus interest, that is, for the same damages already found due PIBC from First American in Part I. No contract exists between PIBC and Dameron. Rather, there are the Letters between PIBC and First American, and the separate Agreements between First American and Dameron. Ordinarily, the lack of privity between a confirming bank, like PIBC, and an account customer, like Dameron, is fatal to claims between such entities. For example, courts and commentators agree that an account customer cannot sue a confirming bank based on the latter's acceptance of nonconforming documents.[33] It is also generally true that an "account party has no obligation to reimburse the confirming bank, which must look to the opening bank." J. Dolan, *The Law of Letters of Credit* ¶ 6.07 at 6–39 n. 156 (1984).

PIBC attempts to surmount this lack of privity with three arguments. First, PIBC contends that Virginia Code § 8.5–107(2) establishes its right to obtain reimbursement from Dameron. That section states:

A confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer.

One of the rights of an issuer that has "duly honored a draft" is "immediate reimbursement" from its customer. Va.Code § 8.5–114(3). PIBC contends that by paying National Marketing it became an issuing bank and Dameron became its customer with an obligation to reimburse PIBC. But the "customer" of a confirming bank is the issuing bank that requested the confirming bank to obligate itself to pay drafts drawn on the Letters. The term "customer" when used with respect to a confirming bank does not refer to the issuing bank's account customer. The Virginia Code gives two definitions of "customer": (i) "the person who causes an issuer to issue a credit" and (ii) "a bank which procures issuance or confirmation on behalf of *that bank's* customer." Va.Code § 8.5–103(1)(g) (emphasis added). The import of these definitions is that First American, by procuring PIBC's confirmation of the letters, became PIBC's customer. PIBC thus acquired a right of reimbursement from its customer, First American. But nothing in the Virginia Code supports PIBC's claim that it also acquired a right of reimbursement from First American's customer, Dameron. *See Instituto Nacional v. Continental Illinois National Bank*, 530 F.Supp. at 283 (holding that account party is not "customer" of confirming bank given wording of · § 5–103(1)(g) of UCC because account party does not "cause" confirming bank to issue letter of credit; issuing bank does that), *aff'd*, 858 F.2d at 1269 (holding that issuing bank is customer of confirming bank).

PIBC's second argument is that the Agreements between First American and Dameron contain indemnities and covenants in favor of First American's "correspondent banks," of which PIBC is one.

---

sent its formal acceptance letter to PIBC on November 16, 1988, well after it had received the documents. *See* FABV Exh. No. 43.)

**33.** *See, e.g., Dulien Steel Products, Inc. v. Bankers Trust Co.*, 298 F.2d 836, 841–42 (2d Cir.1962) (holding confirming bank not liable to account party where (i) no contract existed between them, (ii) no communications between them occurred that could form basis of promissory estoppel, and (iii) no valid reliance occurred that could form the basis of equitable estoppel);

*Instituto Nacional v. Continental Illinois National Bank*, 530 F.Supp. 279, 282–83 (N.D.Ill.1982) (confirming bank owes duty only to issuing bank), *modified*, 675 F.Supp. 1515 (N.D.Ill. 1987), *aff'd as modified*, 858 F.2d 1264 (7th Cir.1988); J. Dolan, *The Law of Letters of Credit* ¶ 6.07 at 6–39 n. 156 (1984) ("confirming bank owes no duty toward account party, who is not its customer"); *but see* McCullough, *Letters of Credit* § 1.05[2] at 1–23 (1990) (stating the opposite opinion but providing no case law or policy grounds for support).

PIBC contends that it is therefore a third party beneficiary of the Agreements and may enforce provisions against Dameron that run in PIBC's favor. Under Virginia law, "[t]he third party beneficiary doctrine is subject to the limitation that the third party must show that the parties to the contract clearly and definitely intended it to confer a benefit on him." *Professional Realty Corp. v. Bender*, 216 Va. 737, 222 S.E.2d 810, 812 (1976); *accord Forbes v. Schaefer*, 226 Va. 391, 310 S.E.2d 457, 463 (1983); *Oman v. Johns–Manville Corp.*, 482 F.Supp. 1060, 1063–64 (E.D.Va.1980), *aff'd, White v. Johns–Manville Corp.*, 662 F.2d 243 (4th Cir.1981). None of the provisions of the Agreement relied upon by PIBC indicates any intention, let alone the requisite clear and definite intention, to obligate Dameron to reimburse First American's correspondent banks for payments made by them to beneficiaries.[34] PIBC's third party beneficiary claim therefore fails.

Finally, PIBC contends that it is entitled to reimbursement from Dameron under principles of equitable subrogation. "Subrogation is the substitution of another person in the place of [a] creditor, to whose rights he succeeds in relation to the debt." 18 Michie's Jurisprudence, *Subrogation* § 2 at 3 (1985). "Subrogation depends upon a relationship of principal and surety, or of primary and secondary liability, or a situation in which one person is compelled, even though only for his own protection and without obligation to another, to pay

some other person's debt." *Id.* § 4 at 7. Subrogation is a creature of equity. "It is founded on equity and benevolence and it is not to be allowed except in a clear case and where it works no injustice on others." *State–Planters Bank & Trust Co. v. Pollard and Bagby Investment Corp.*, 186 Va. 217, 42 S.E.2d 287, 291 (1947). Because subrogation is not a matter of right, but of equity, its appropriateness "depends upon the facts of each particular case, to which must be applied the principles of justice." *Id.; accord*, 14 Michie's Jurisprudence, *Subrogation* § 4 at 6 (1985). In the instant case, PIBC has a contractual, and therefore legal, right to recover the amount of the payments plus interest from First American. *See* Part I, *supra.* There is therefore no basis for equitable relief. PIBC's subrogation claim must therefore be dismissed.

### III. *Dameron's Obligation to Reimburse First American*

■ Having found that PIBC has a legal right to payment from First American, but not from Dameron, the Court turns next to First American's claim that Dameron must reimburse it for any amount it must pay PIBC under the Letters. First American relies on the Agreements executed by Dameron to obtain the Letters. In the Agreements, Dameron pledged to indemnify First American for the latter's acts with respect to the Letters as long as such acts were

---

34. PIBC relies on paragraphs 4, 6, 8, and 10–12 of the Agreements. Memorandum of Points and Authorities Opposing Dameron and Richard Pitts's Motion for Summary Judgement, filed Nov. 29, 1990, at 8. In paragraph 4, Dameron pledges to reimburse First American for "all charges and expenses" incurred in connection with the Letters, including "correspondents' charges" if any. In Paragraph 6, Dameron grants First American a security interest in certain property and documents, including property and documents coming into the possession of First American's correspondent banks. Paragraph 8 simply states that First American and its correspondents may accept certain types of shipping documents as conforming to the Letters. Paragraph 10 states that the terms of the Agreement will apply to any extensions or modifications of the Letters, and to any actions taken by First American's correspondents under such extensions or modifications. Paragraph 11 provides that First American and its correspondents may accept documents with certain discrepancies and make payment provided they are furnished with an indemnity from the beneficiary running in Dameron's favor. Finally, paragraph 12 states that no actions of First American or its correspondents with respect to matters pertaining to the Letters, if taken in good faith, shall result in liability to Dameron. It is clear that in these provisions Dameron pledged to reimburse First American, alone, for certain expenses, and to indemnify First American and its correspondents against liability to Dameron for certain acts taken by them. The provisions evince no intent to obligate Dameron to reimburse the correspondents.

taken in good faith.[35] And, First American correctly notes that Dameron has not shown any bad faith on the part of First American with respect to accepting the documents. Dameron argues, however, that the good faith standard in the Agreements violates Virginia law and hence is void. Therefore, Dameron continues, First American's failure to note the missing Statement of the Beneficiary, though not a breach of good faith, nevertheless relieves Dameron of any obligation to reimburse First American.[36]

It is not necessary to reach the unsettled, thorny question whether the Agreements, which appear to be standard form contracts employed by First American, violate Virginia law.[37] Even assuming first that the Agreements run afoul of Virginia law, next that First American is obligated, as Dameron contends, by Virginia Code § 8.5–109(2) to "examine documents with care so as to

---

**35.** Application and Agreement for International Commercial Letter of Credit, ¶ 12. FABV Exh. Nos. 1 & 2.

**36.** Dameron also alleges that First American failed to note missing "notations" required by the Letters as well as the missing Statement of the Beneficiary. Virginia Code § 8.5–108(1) states that "a credit which specifies that any person purchasing or paying drafts or demands for payment under it must note the amount of the draft or demand on the letter" is a "notation credit." Section 8.5–108(2)(b) appears to require a confirming bank that negotiates a "notation credit" to forward either the letter of credit itself with the draft or a statement that the notations have been made. The same section provides that if neither document is forwarded, "the issuer *may* delay honor until evidence of notation has been procured...." (Emphasis added.) The Letters at issue state: "THE AMOUNT OF EACH DRAW MUST BE ENDORSED ON THE REVERSE OF THIS LETTER OF CREDIT BY THE NEGOTIATING BANK." Dameron *contends that this statement renders* the Letters "notation credits." First American argues that this language does not convert the Letters to notation credits because it does not specifically track the language of § 8.5–108(1). Both parties agree that notations were not made on the Letters and that no statement from PIBC certifying notation was forwarded to First American. Even assuming that the Letters constitute notation credits subject to Section 8.5–108, First American's failure to note the absence of a statement concerning notations does not absolve Dameron from reimbursing First American. First, Section 8.5–108 appears designed to protect issuing banks, not their customers. Section 8.5–108(2)(b) states that "the issuer *may* delay honoring until evidence of notation has been procured which is satisfactory to it...." The section does not *require* an issuer to withhold honoring under such circumstances. Moreover, the remedy for failure to make proper notations, according to the Official Comment, is that the negotiator of the letters must "reimburs[e] the issuer for any loss occasioned by the failure." Va.Code § 8.5–108, Official Comment 2. The central purpose of the notations requirement is to prevent draws in excess of a letter of credit's limit. In this regard, Dameron does not contend that amounts were drawn which exceeded the limits of the Letters. Furthermore, the Agreements between Dameron and First American specifically indemnify First American against "the failure of any person to note the amount of any draft on the reverse of the Credit." Agreements, ¶ 12. Finally, even if a statement concerning notations were required to accompany the drafts at issue, Dameron has waived its right to object to this documentary discrepancy for the same reasons stated in the text, *infra*, with respect to the alleged missing Statement of the Beneficiary.

**37.** Virginia Code § 8.5–109(2) states that "[a]n issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the [letters of] credit...." Section 8.1–102(3) of the Code, a general provision applicable to the entire Virginia UCC, states that

> [t]he effect of provisions of this act may be varied by agreement ... *except that the obligations of* good faith, diligence, reasonableness and *care* prescribed by this act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

[Emphasis added.] Dameron contends that the effect of the Agreements is impermissibly to substitute a standard of good faith for the standard of care required by § 8.5–109(2), thus violating §§ 8.5–109(2) and 8.1–102(3). First American contends that the Agreements merely determine the standards by which the duty of care prescribed by § 8.5–109(2) is to be measured. This matter appears to be an unsettled issue in UCC law. *See* J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 19–8 at 865 (3d ed.1988) (concluding that while "broad exculpatory provisions" in such bank contracts "are of doubtful validity, clauses of more limited application should withstand the test of 1–102(3)"). It is not necessary to reach this issue. If the Agreement is valid, First American prevails under its good faith standard. If invalid, and First American is deemed to have breached a due care standard, Dameron has waived its right to assert that breach, and First American still prevails.

ascertain that on their face they appear to comply with the terms" of the Letters, and finally that First American breached this duty by failing to note the absence of the Statement of the Beneficiary, the Virginia UCC and the common law of letters of credit still bar Dameron's claim because Dameron accepted the documents and used them to gain control of the T-shirts. Under these circumstances, Dameron cannot rely on documentary discrepancies to avoid honoring its Agreements with First American.

The Agreements between First American and Dameron state that they shall be governed by Virginia law. Title 8.5 of Virginia's UCC, which pertains to Letters of Credit, contains no provision governing an account customer's remedies for wrongful honor by an issuing bank.[38] Section 8.5-102(3), however, frankly admits that Title 8.5 "deals with some but not all of the rules and concepts of letters of credit...." The section invites the application of "rules or concepts ... developed prior to this act or ... hereafter" to "a situation not provided for ... by this title." *Id.* Official Comment 2 to § 8.5-102 gives further direction to courts grappling with issues not covered by Title 8.5:

> The rules embodied in [this title] *can be viewed as those expressing the fundamental theories underlying letters of credit.* For this reason the second sen-

tence of subsection (3) makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so. Under Section 1-102(1) [Va. Code § 8.1-102(1)] such application is to follow the canon of liberal interpretation to promote underlying purposes and policies. Since the law of letters of credit is still developing, conscious use of that canon *and attention to fundamental theory by the court are peculiarly appropriate.*

(Emphasis added.) Thus, in ascertaining Dameron's remedies as an account customer for First American's wrongful honor, this Court is directed by Virginia law to apply the "fundamental theory" of letters of credit and the "canon of liberal interpretation" in Virginia Code § 8.1-102.[39] *See Instituto Nacional v. Continental Illinois National Bank,* 858 F.2d at 1268-69 (similarly interpreting § 5-102(3) of the Illinois UCC).

A review of the few existing, apposite cases indicates that under the common law of letters of credit an account customer, by accepting documents from the issuing bank and subsequently "surrendering the documents [to shippers or customs officials] and accepting a substantial portion of the goods ... waive[s] its right to seek strict enforcement of the letter of credit." *Dorf Overseas Inc. v. Chemical Bank,* 91 A.D.2d 895, 457 N.Y.S.2d 513, 514 (1983).[40]

---

**38.** *See* Va.Code §§ 8.5-101 to 8.5-117; *see also* J. Dolan, *The Law of Letters of Credit* ¶ 9.03[5] at 9-32 (1984) ("[w]hile Section 5-115 [of the UCC] defines letter-of-credit rules for the disappointed beneficiary's damages upon wrongful dishonor, it is silent on the extent of the disappointed account party's damages for wrongful honor or dishonor. The matter appears to be one of non-Code law, and the cases are few") (citations omitted); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 19-8 at 864 (3d ed.1988) (stating, "What is the proper measure of damages for wrongful honor? Article Five is silent").

**39.** Section 8.1-102 provides that Virginia's UCC is to be "liberally construed" to "promote its underlying purposes and policies," which are:
(a) to simplify, clarify, and modernize the law governing commercial transactions;
(b) to permit continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.
Va.Code § 8.1-102(2)(a)-(c).

**40.** *Accord, Bank of New York & Trust Co. v. Atterbury Bros., Inc.,* 226 A.D. 117, 234 N.Y.S. 442, 449 (1929) (granting summary judgment for bank where defendant held documents "without protest for two weeks" despite discrepancies and documents were then discovered to be forgeries), *aff'd,* 253 N.Y. 569, 171 N.E. 786 (1930); *Williams Ice Cream Co. v. Chase National Bank,* 210 A.D. 179, 205 N.Y.S. 446, 449 (N.Y. App.Div.1924) (with respect to alleged alteration of letter of credit, "plaintiff ... waived any such contention by reason of its having taken and used the goods"); *see also J & K Plumbing & Heating Co. v. ITT,* 51 A.D.2d 638, 378 N.Y.S.2d 822, 825 (N.Y.App.Div.1976) ("plaintiff, by its acceptance of the benefits of the ... sale and its submission to ITT of ... two checks ... plainly indicated its belief that said payments were properly due, and such conduct constitutes a

This result "is the only one consistent with principle and common sense." H. Harfield, *Bank Credits and Acceptances* 107 (5th ed. 1974). Fundamental to letter of credit transactions is the principle that both the letter of credit and also the separate agreement between account customer and issuing bank are transactions in documents entirely independent from the underlying sale of goods. This principle compels the conclusion that an account customer who has failed to reject documents in timely fashion and, instead, has used them to obtain the goods is deemed to have waived any claim of documentary inconsistencies. A leading commentator explains:

> We begin with the fundamental proposition that a letter of credit involves a transaction in documents and not goods. We note the fact that the customer, and not the bank, specifies the documents that are to be presented. We note the fact that those documents, specified by the customer, are prepared or procured by the customer's mercantile counterparty, and not by the bank, which is obligated only to examine them, upon presentation, with care to see that on their face they appear to be what the customer specified. Finally, we note that there is no such thing as a latent discrepancy.
>
> If then the customer accepts, or fails seasonably to reject, the documents, it is manifestly inequitable to permit him, at a later date, to repudiate his own acts to the detriment of the bank. There may be room for dispute as to whether the customer accepted the documents, or as to whether his failure to reject was tantamount to acceptance. It is evident that, in either case, the customer is entitled to a reasonable time within which to examine the documents, but it should

also be evident that when it comes to an examination of documents specified by the customer, not much time is required, nor is significant delay excusable. An examination of documents involves none of the complexities that may be involved in an inspection of merchandise to verify quantity and quality. All that is required is that the documents be regular on their face; the task is one of recognition rather than analysis.

> If, after such prompt examination, the customer seasonably rejects them for defects apparent on their face, the right to reject is accompanied by the obligation to return the documents, as received, to the bank. Accordingly, the account party should be certain that documents are in order before exercising any dominion over them or the goods they purport to represent.

*Id.* at 107–08. An account customer, if it desires to claim discrepancies, has a duty to return documents to the issuing bank rather than use them to obtain control over the goods.[41] The documents provide some compensation to a bank which has inadvertently honored nonconforming documents. "[T]he bank's loss will be the amount of the payment which it has made under the credit less any amount which it may realize from disposition of the documents which it has purchased." *Id.* at 105. The result is equitable. The beneficiary/seller is paid by the bank for the goods; the bank owns the documents and title to the goods; and the account customer has avoided paying for goods that, because of discrepancies in the documents, it feared accepting. This rule also avoids the inequitable result of a windfall for the account customer in the form of obtaining goods never paid for. While some commentators have favored less stringent rules with respect to an account

waiver of plaintiff's claim of" fraud); *North American Foreign Trading Corp. v. General Electronics, Ltd.,* 67 A.D.2d 890, 413 N.Y.S.2d 700, 703 (1979) (noting generally that where "purchaser had taken up the bill of lading and accepted delivery of merchandise," waiver could be implied as a matter of law, but "waiver may not be implied as a matter of law" where merchandise was released by bank to purchaser before purchaser's receipt of documents).

**41.** This duty is similar to the explicit obligation imposed on issuing and confirming banks by Virginia Code § 8.5–112(2) and by Article 16 of the UCP to return documents to the presenter if the bank is dishonoring a draft.

customer's acceptance of documents,[42] the rule just stated has gained the widest acceptance in American case law and best reflects the fundamental theory underlying letters of credit.[43]

**42.** Harfield, quoted in the text, presents the most in-depth analysis found of an account customer's remedies for an issuing bank's inadvertent acceptance of nonconforming documents. Harfield's conclusion, discussed *supra*, is that an account party must reject and return nonconforming documents within a reasonable period or be deemed to have waived its right to object to documentary inconsistencies. *See also* S. Farrar, "Incidents of Improper Performance," in Practicing Law Institute, *Letter of Credit and Bankers Acceptances* 512–13, 520 (Ryan ed. 1988) (stating that in cases of wrongful honor issuer loses right to reimbursement while account party has no right to special or consequential damages, and observing that "[w]aiver and estoppel usually arise in context of beneficiary against issuer for wrongful dishonor, *and account party suit against issuer for wrongful payment*") (emphasis added). Some commentators have favored other rules.

In an early treatise, Finkelstein contended that an account customer should be able to accept nonconforming documents, reimburse the issuing bank, but deduct any direct or consequential damages flowing from the bank's acceptance of nonconforming documents. Finkelstein likened this to a buyer's ability to keep nonconforming goods, retain its right of action against the seller for breach of contract, and recover consequential damages. Finkelstein, *Legal Aspects of Commercial Letters of Credit* 195–97 (1930). Even Finkelstein, however, rejected Dameron's claim that it should be able to keep the nonconforming documents and related goods and pay nothing to the issuing bank. Such a result, he noted, "has no foundation in justice, business usage, or common sense." *Id.* at 196–97.

More recently, Kozolchyk took a middle ground between Finkelstein and Harfield. Kozolchyk, *Commercial Letters of Credit in the Americas* 322–26 (1966). Kozolchyk noted that Harfield's view represented "contemporary United States doctrine," *id.* at 323, and that the view that consequential damages are inappropriate in wrongful honor suits appeared established, at least in New York case law. *Id.* at 326. Kozolchyk, too, rejected *consequential* damages as being inapplicable in the wrongful honor context. He believed, however, that an account customer might be permitted to receive *"direct and foreseeable"* damages, and urged American courts to adopt the practice found in some other countries of permitting an account customer to accept documents while expressly reserving a right of action against the bank for document inconsistencies. *Id.* at 316, 324. *See also* J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 19–8 at 864–65 (3d ed. 1988) (suggesting that an account customer might recover damages pertaining to defective goods from an issuing bank that wrongfully honors a draft, but providing no case law or reasons for this conclusion and observing that "[b]ecause customers are so infrequently successful in suing issuing banks for wrongful honor, the law here is quite undeveloped"); Dolan, *The Law of Letters of Credit* ¶ 9.03 at 9–35, 9–36 (1984) (observing merely that disputes between issuing banks and account parties should be governed by "contract remedy rules" unless such rules are inadequate).

Kozolchyk's statements actually strengthen the Court's decision here to rely on the analysis found in the cases cited in the text *supra* and Harfield's treatise. Kozolchyk indicates that this analysis is the most prominent in American case law. Moreover, Kozolchyk's recommendation that foreseeable, direct damages be recoverable would appear applicable, if at all, only in a limited number of cases, and certainly not this case, where the primary harm to Dameron stemmed from the delivery of inferior goods. *See Linden v. National City Bank*, 12 A.D.2d 69, 208 N.Y.S.2d 182, 184 (1960) (holding that "[p]laintiff's alleged damages [stemming from the delivery of inferior goods] are not in any sense the natural and probable consequences of defendant's alleged breach of conditions of the first letter of credit.... *defendant's act in paying the first letter of credit ... would be incidental only to seller's breach of contract....*").

Thus, even if the Court were to accept the notion that an account customer should be able to accept documents and goods and then sue for *direct* damages resulting from a bank's acceptance of nonconforming documents, it would not permit Dameron to reduce the payment owed to First American by any damages stemming from National Marketing's delivery of faulty goods. Such damages stem from the seller's breach, not First American's. Moreover, even if the court were to hold that an account customer could receive damages from the issuing bank stemming from the receipt of faulty goods, Dameron has already been compensated for such receipt through its settlement with National Marketing. There is no reason in this case for Dameron not to reimburse First American for the full amount First American paid for the goods.

**43.** Suggestions that an account customer may receive "direct," or even "consequential," damages from an issuing bank fail to appreciate the independence of the contracts in a letter of credit transaction. The agreement between account party and issuing bank cannot be easily linked or analogized to the sale of goods contract, particularly with respect to damages. While a buyer of goods may suffer direct and consequential damages from a seller's delivery of nonconforming goods, an account party suffers no such damages from a bank's delivery of nonconforming documents. This is so for two reasons. First, any damages stemming from the

The undisputed facts of this case are that shortly after October 25, 1988, First American transferred the documents at issue to Dameron. Dameron did not note any discrepancies; rather, it used the documents to take possession of the T-shirts. Until July 1989, when it brought suit against National Marketing, Dameron attempted to sell the T-shirts, apparently with disappointing results, and to work out a deal with National to compensate Dameron for the nonconforming goods. On three occasions during this period, Dameron pledged to reimburse First American for honoring the drafts related to the T-shirts in exchange for extensions of time for payment.[44] Furthermore, Dameron obtained a court order attaching payment of the drafts, which order was not lifted until Dameron had settled its law suit with National Marketing. The terms of this settlement have been kept confidential by Dameron, although it stated that it received some monetary compensation under the settlement. It is reasonable to assume that a portion of the settlement was intended to compensate Dameron for the substandard quality of the T-shirts. Not until approximately a year or more after receipt of the documents and goods, did Dameron raise the issue of the missing Statement of the Beneficiary. The undisputed facts therefore show that Dameron delayed informing First American of any discrepancies for more than a reasonable period of time. It failed to return the documents to First American and instead took control of the goods. By these acts, Dameron waived its right to reject nonconforming documents and bound itself to reimburse First American for the amount of the drafts.[45]

---

delivery of inferior goods are not causally related to an issuing bank's failure to note documentary discrepancies. The inferior goods stem from the beneficiary's breach of the sales contract, not from any negligence of the issuing bank. Second, an issuing bank's negligence in failing to note discrepancies does not injure an account customer because that customer has an independent chance, and duty, to inspect the documents. If the account customer finds discrepancies, it then may either waive the discrepancies and accept the goods, or reject the documents, return them to the bank, and pay nothing. This is the same position the account customer would be in had the bank noted the discrepancies and called them to the attention of the account customer. It is the account customer's own negligence in failing to note documentary discrepancies that may result in its being forced to pay for goods when it might otherwise have withheld payment. Even when the account customer fails to note discrepancies, it may sue the beneficiary for breach of the sale of goods contract, as occurred in this case. The above analysis does not eliminate the incentive for an issuing bank to use "due care" in inspecting documents. A bank that simply accepts documents without inspection and passes them to its customer runs the risk of having the documents returned by the customer as nonconforming, in which event it would be left with the documents, inferior goods, and the burden of attempting to sell the goods. This analysis explains why commentators have been unable to describe what damages an account customer suffers from a bank's inadvertent failure to note discrepancies, and why little case law exists discussing such damages. It also explains why Harfield insists that the contract for documents between account customer and issuing bank is different in kind from a sale of goods contract

and that no remedy for breach of the former exists other than timely rejection of the documents:

> The concept of consequential damages, *whether or not they may be such as are foreseeable in a mercantile sense,* has no place in a commercial credit transaction. As indicated above, the customer (account party) may accept or reject documents against which the bank has improperly made payment. If he accepts, the transaction is closed, as between him and the bank. If he rejects, he is entitled, *upon surrender of the documents,* as received, to claim back any prepayment or collateral, *but no other damages are recoverable.*

H. Harfield, *Bank Credits and Acceptances* 108 (1974); *see Linden v. National City Bank of New York,* 208 N.Y.S.2d at 184 (bank's payment against documents showing nonconforming goods "would be incidental only to the seller's breach of contract").

**44.** FABV Exh. Nos. 46, 57, 59.

**45.** Dameron contends that it cannot be deemed to have waived the requirement that the Statement of the Beneficiary accompany the documents because it was not aware that the statement was missing and believed First American had retained it. Dameron relies on cases holding that "one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Voest–Alpine International Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 685 (2d Cir.1983); *see Fox v. Deese,* 234 Va. 412, 362 S.E.2d 699, 707 (1987); *Consolidated Sales Co. v. Bank of Hampton Roads,* 193 Va. 307, 68 S.E.2d 652 (1952). Dameron misperceives the right at issue and the governing

A different result would conflict with both existing case law and the fundamental theory of letters of credit. Moreover, any different result in this case would be manifestly unjust. Permitting Dameron to avoid reimbursing First American for either part or all of the purchase price of the T–shirts, when Dameron retained the T–shirts and reached a monetary settlement with National Marketing, would simply be inequitable. In sum, First American's cross-claim against Dameron should be granted, and Dameron will be ordered to reimburse First American for the amount of the drafts plus interest. Accordingly, Dameron's and Richard Pitts' cross-claim against First American will be dismissed.[46]

law. Dameron's cases requiring specific knowledge and intention are inapposite here; instead, the waiver applicable here works by operation of law based on Dameron's actions. Specifically, Dameron is deemed by operation of law to have waived its right to raise documentary discrepancies of any kind, not merely the specific requirement that the Statement of the Beneficiary accompany the draft. Dameron was aware of its right to demand compliance with the Letters, as evidenced by the terms of the Letters and Agreements and by its actions upon discovering the absence of the Statement of the Beneficiary. Moreover, it may be assumed that Dameron had "constructive, if not actual, knowledge of that right." *Voest–Alpine,* 707 F.2d at 685 (holding that confirming bank had either constructive or actual knowledge of its right to demand strict compliance with letters of credit). Dameron's intention to relinquish this right is established "as a matter of law" by its acceptance of documents from First American and its use of them to obtain control of the goods. *See Dorf Overseas, Inc. v. Chemical Bank,* 457 N.Y.S.2d at 514, and cases cited *supra* note 40; *see also* Va.Code § 8.5–113(2)(b) (giving account customer ten days to raise objections to documents after which it automatically loses protection of negotiating bank indemnities).

**46.** Dameron and Richard Pitts make several arguments in support of their cross-claim, none of which is persuasive. They contend that First American breached a fiduciary duty owed to Dameron and also acted negligently (1) by "failing to explain to the Pitts the meaning of PIBC becoming a confirming bank," (2) by "failing to explain the meaning of a waiver of the discrepancies in the shipping documents," and (3) by "failing to discover discrepancies in the shipping documents other than those that were the subject of the proposed waiver." Dameron bases its claim of fiduciary duty on the fact that it had a "banking relationship" based on the Letters with First American and on an alleged agreement of First American, made during discussions with Richard Pitts, to provide the advice and counsel necessary to protect the interests of Dameron and the Pitts in regard to the Letters. The Court finds that no special relationship existed between Dameron and First American that gave rise to a fiduciary duty "to protect the interests of Dameron" in regard to the Letters. Dameron's and Richard Pitts' argument amounts to a claim that First American pledged to indemnify Dameron against any harm that might come to it from First American's inadvertent mistakes or from Dameron's failure to understand the legal implications of the Agreements and Letters. This claim directly contradicts Dameron's written Agreements with First American. In those Agreements, Dameron indemnified First American against liability for any good faith action, inaction, or omission taken by First American in connection with the Letters. Agreements, ¶ 12. The uncontroverted record shows that the relationship at issue was an arms-length business relationship governed by contract, specifically the Agreements, two Commercial Notes, and the Continuing Guaranties executed by Dameron and the Pitts. *See* H. Harfield, *Bank Credits and Acceptances* 103 (stating "relationship between the issuing bank and the account customer is contractual" and "quasi-fiduciary obligation has no place in the issuance ... of documentary letters of credit"); J. Dolan, *The Law of Letters of Credit* ¶ 9.03[3] at 9–29 (issuing bank not agent of account party). Moreover, the facts alleged in the supporting affidavit of Richard Pitts do not amount to a fiduciary relationship under Virginia law. Pitts avers that he informed First American that he was a novice with respect to letter of credit transactions and that, in turn, First American agreed to provide advice and counseling "in the handling of these letters of credit." But the mere giving of advice to inexperienced clients does not create a fiduciary relationship between a bank and its customers. *Hancock v. Anderson,* 160 Va. 225, 238, 168 S.E. 458, 462 (1933); *accord Reid v. Key Bank of Southern Maine, Inc.,* 821 F.2d 9, 17–18 (1st Cir.1987); *see Steinbrugge v. Haddock,* 281 F.2d 871, 874 (10th Cir.1960) ("mere reliance upon the superior knowledge and judgment of another, who knows of this reliance" does not establish a fiduciary relationship); *see also Weinberger v. Kendrick,* 698 F.2d 61, 79 (2d Cir.) (noting that "it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table"), *cert. denied, Coyne v. Weinberger,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). To establish a fiduciary duty "there must have been something in the course of dealings ... from which it can be inferred that the ordinary right to contract has been surrendered." *Hancock,* 168 S.E. at 463. Here, the existing written Agreements contradict the assertion of a fiduciary relationship. "[W]hen a contract is not in its nature essentially fiduciary, a trust, to be

■ One final issue remains with respect to the cross-claims. First American contends that Richard, Marga, James and Nancy Pitts are personally liable for any amount Dameron owes First American under the Agreements. First American relies on two Commercial Notes signed by Dameron and two Continuing Guaranties, one signed by Richard and Nancy Pitts, the other by James and Nancy Pitts. The two Commercial Notes were signed by Dameron on the same day that First American issued the two Letters. Each Note is for $135,000, just as each Letter permitted drafts to be drawn up to $135,000. Dameron and the Pitts contend that the Commercial Notes signed by Dameron are inapplicable to any debt Dameron owes for drafts drawn under the Letters. They rely on language in the Notes stating that Dameron "may, by making a request for advance, borrow ... amounts which when aggregated do not exceed the principal sum stated above." Dameron contends that it made no request for an advance, and hence incurred no indebtedness under the Notes. The Pitts argue that because Dameron incurred no indebtedness covered by the Commercial Notes, they are not obligated under the Continuing Guaranties that they signed.

The Pitts' contentions fail for two reasons. First, the Commercial Notes also state that First American

> may, at its option, make advances pursuant to other means or forms of request. Advances may be made by credit to Borrower's deposit account with Bank, and if so, Borrower shall be liable to Bank for such advance without regard to the proper authorization for the advance.[47]

Under this broad language, First American's payments under the Letters and the Agreements plainly qualify as "advances" within the contemplation of the Commercial Notes. Second, the language of the two Continuing Guaranties is itself broad enough to obligate the Pitts to reimburse First American, regardless of Dameron's liability under the Commercial Notes. The Continuing Guaranties state in relevant part:

> the undersigned ... in order to enable Dameron International, Inc., hereinafter called "Debtor," to obtain credit from time to time from FIRST AMERICAN BANK ... hereby absolutely and unconditionally guarantees full and prompt payment when due ... [of] any indebtedness, including present and future indebtedness, of Debtor to the Bank, evidenced by promissory notes, advances, credits, liabilities or charges of every kind owed to the Bank by the Debtor....[48]

Whether or not Dameron is obligated under the Commercial Notes, it is obligated under the Agreements to reimburse First American for payments made under the Letters. This obligation constitutes an "indebtedness" or liability of Dameron's for which the Pitts are personally liable under the Continuing Guaranties. *See Pascoe Steel Corp. v. Shannon,* 224 Va. 530, 298 S.E.2d 97 (1982) (finding similarly-worded guaranty to be "a continuing one" personally binding defendant as to all liabilities incurred by principle); *Bank of Southside Virginia v. Candelario,* 238 Va. 635, 385 S.E.2d 601 (1989) (same); *see also Bennett v. First National Bank of Norfolk,* 213 Va. 672, 194 S.E.2d 903, 905 n. 2, 907 (1973) (finding plaintiff personally liable under similarly-worded guaranty containing indebtedness limitation). First American's cross-claim

---

established, must be expressly reposed or necessarily implied." *Id.; see also Vargas v. Esquire,* 166 F.2d 651, 652–53 (7th Cir.) (applying Illinois law and holding that where fiduciary relationship does not exist as a matter of law, proof of such "must be clear, convincing, and so strong as to lead to but one possible conclusion"), *cert. denied,* 335 U.S. 813, 69 S.Ct. 29, 93 L.Ed. 368 (1948); *accord Lawrence v. Muter Co.,* 171 F.2d 380, 385 (7th Cir.1948), *Metropolitan Trust Co. v. Muter Co.,* 337 U.S. 907, 69 S.Ct. 1049, 93

L.Ed. 1720 (1949); *Karkomi v. American Airlines, Inc.,* 717 F.Supp. 1340, 1342 (N.D.Ill.1989). The record does not contain facts sufficient to support a finding of a fiduciary relationship, and Dameron, by accepting the documents and goods, waived its right to object on negligence or contractual grounds to the failure to note documentary discrepancies.

**47.** FABV Exh. Nos. 5 & 6.

**48.** FABV Exh. Nos. 7 & 8.

will therefore be granted as to the Pitts as well as Dameron.

IV. *PIBC's Fraud and Breach of Duty of Good Faith and Fair Dealing Counts Against First American*

With the liability issues under the Letters and related Agreements decided, the Court turns next to the remaining counts in PIBC's Complaint. Counts IV and V allege that First American engaged in fraud. Specifically, PIBC contends that First American made promises in June and July 1989 to pay PIBC in the future, knowing at the time that such promises were false and that it did not intend to pay. First American has moved for summary judgment on these claims. "The standard for granting summary judgment is akin to that of granting a directed verdict:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.... [T]he judge must ask himself ... whether a fair-minded jury could return a verdict for plaintiff on the evidence presented."

*Sibley v. Lutheran Hospital of Maryland, Inc.*, 871 F.2d 479, 483 (4th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)); *accord Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir.1990). With respect to the claims at issue, "the inquiry involved in a ruling on a motion for summary judgment necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512.

The elements of actual fraud in Virginia are:

> (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.

*Winn v. Aleda Const. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984); *accord*

*Meridian Title Insurance Co. v. Lilly Homes, Inc.*, 735 F.Supp. 182, 185 (E.D.Va. 1990). "As a general rule, 'fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated upon unfulfilled promises or statements as to future events.'" *Patrick v. Summers*, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988) (quoting *Soble v. Herman*, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940) (holding that unfulfilled promise to pay debt was not a representation)). The Supreme Court of Virginia recognizes an exception to this general rule, however. *Colonial Ford* teaches that fraud exists where a promisor intends not to perform at the time a promise of future performance is made:

> While the failure to perform an antecedent promise may constitute breach of contract, the breach does not amount to fraud. But the promisor's intention—his state of mind—is a matter of fact. When he makes the promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud.

*Colonial Ford Truck Sales v. Schneider*, 228 Va. 671, 677, 325 S.E.2d 91, 94 (1985); *accord Sea–Land Service, Inc v. O'Neal*, 224 Va. 343, 351, 297 S.E.2d 647, 651–52 (1982); *Lloyd v. Smith*, 150 Va. 132, 145–47, 142 S.E. 363, 365–66 (1928). A party attempting to prove a promisor's false intent, like any party attempting to prove fraud under Virginia law, carries a heavy evidentiary burden. "In Virginia, clear, cogent, and convincing evidence is necessary to establish an action for fraud and deceit." *Patrick v. Summers*, 369 S.E.2d at 164; *accord Carter v. Carter*, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982). In the instant case, there must be "clear, cogent, and convincing proof" that the promisor "had the intent to defraud at the time he made the promise." *Patrick v. Summers*, 369 S.E.2d at 164 (setting aside jury verdict and holding that plaintiffs' evidence as to falsity of broker's promise to purchase home failed to meet "the increased proof the law requires to establish fraud").

PIBC contends that First American made fraudulent promises in June and July 1989 to honor PIBC's drafts under the Letters. The specific promises were made on June 6, 1989, June 21 and 23, 1989, July 21, 1989, and in the week following July 21, 1989. The relevant evidence is as follows. In May 1989, Dameron requested that First American obtain a third extension of payment from May 21, 1989 to June 21, 1989. First American made the request, informing PIBC that "SPECIAL ARRANGEMENTS REGARDING THESE PAYMENTS" had been made by "BUYERS AND SELLERS." [49] PIBC agreed to the extension. Subsequently, on June 6, 1989, First American confirmed the new arrangement by sending a telex to PIBC that stated: "WE AGREE TO PAY INTEREST PAYMENTS OF PRIME PLUS 2 PCT. PAYABLE AT MATURITY ALONG W/ PRINCIPAL ON JUNE 21, 1989." [50] Sometime in June or July, 1989, Richard Pitts of Dameron called William von Berg, the Vice President of First American's International Department, and informed him that, because Dameron was continuing to receive goods of inferior quality from National Marketing, Dameron desired not to pay the $95,904 drawn under the letters. Von Berg told Pitts that the bank would be obligated to honor the drafts, and that if Pitts did not "want the letter of credit paid, ... his only alternative was to sue the bank to enjoin [it] from paying...." [51] A day before the June 21, 1989 deadline, Dameron, by letter, informed Steve McDaniel, an Assistant Vice President at First American, that Dameron desired another thirty-day extension, to July 21, 1989. The letter described arrangements whereby Dameron and National Marketing were close to settling their differences and assured First American that National Marketing and Petra Bank of Jordan supported such an extension. [52] PIBC at first objected to granting this extension, but relented on June 23, 1989. [53] The day before the July 21, 1989 deadline, Richard Pitts called von Berg of First American and informed him that Dameron had obtained the writ of attachment. Von Berg admits that he then told Dameron that First American would obey the writ of attachment and not honor the drafts. Von Berg testified further at his deposition, however, that on the afternoon of the next day, a Friday, he left for a two-week vacation, and that he did not recall discussing the issuance of the attachment with any other officials at First American. [54] On Friday, July 21, 1989, Frederico Manno, Assistant Vice President of First American's International Department, sent a telex to PIBC that stated: "PLEASE BE INFORMED THAT THE ABOVE PAYMENT PLUS INTEREST WILL BE PAID TO YOU EARLY NEXT WEEK. THANKS AND REGARDS." [55] Manno testified at his deposition that he sent the telex because he received a telephone call from Richard Pitts on either July 20th or 21st requesting an extension of time for payment until "early next week." Manno testified further that he was not told of the attachment by either von Berg or Pitts and learned of it only when a copy of it crossed his desk on July 28, 1989, the day First American informed PIBC that it could not pay because of the attachment. [56] Lourdes Diestro, an officer

**49.** FABV Exh. No. 54.

**50.** FABV Exh. No. 58.

**51.** Deposition of William von Berg, at 34.

**52.** FABV Exh. No. 59.

**53.** PIBC's consent may have been secured by its affiliate, Petra Bank of Jordan. On June 20, 1989, Bassem Farouki, National Marketing's principal, informed PIBC that Dameron would be requesting another thirty-day extension. FABV Exh. No. 60. Hence, PIBC was under pressure to grant an extension from the benefi-

ciary, National Marketing, as well as Dameron and First American. On June 22, 1989, Richard Pitts wrote a letter to Bassem Farouki, apparently at the latter's request, to be used by Farouki to convince the Chairman of Petra Bank, Jordan, to persuade PIBC to grant the extension. FABV Exh. No. 65.

**54.** Deposition of William von Berg, 36–39, 55–57.

**55.** FABV Exh. No. 69.

**56.** Deposition of Frederico Manno, October 11, 1990, at 20–26, 41–44. Deposition of Frederico Manno, February 7, 1990, at 75, 81–82.

of PIBC, testified that she called First American on July 20th or 21st, and numerous times the week of Monday, July 24th, demanding payment. She states that she spoke with Ronald Khoshabeh of First American, who repeatedly told her that the payment would be made.[57]

These undisputed facts compel the conclusion that no valid fraud claim has been made. The only relevant evidence presented by PIBC that pertains to the promises to pay made on June 6, 1989 or during the period June 21–23, 1989, is von Berg's testimony that sometime in June or July Richard Pitts informed him that Dameron did not want to pay, and von Berg replied that First American was obligated to pay and would pay unless sued by Dameron and enjoined. This evidence constitutes no proof of fraud. With respect to the promise to pay sometime "early next week" made by Frederico Manno on July 21, 1989, PIBC contends that "for Mr. Manno to assert that dishonoring the payment and stalling PIBC for five business days was solely his decision when his immediate superior [*i.e.*, von.Berg] know [sic] that an attachment order had been signed strains credulity...." [58] The above statement and statements made by PIBC during oral argument make clear that PIBC's primary hope is that a jury would disbelieve von Berg's and Manno's testimony that neither

discussed the attachment before Manno received a copy of it on Friday, July 28th. If this occurred, a jury might further conclude that Manno's promise to pay early next week was intended to stall PIBC until a copy of the attachment was obtained or served. PIBC asserts that "where, as here, there is enough evidence, even though conflicting, to make out a prima facie case, the question of whether there was fraud is properly one for the jury." This is not the standard. "In Virginia, clear, cogent, and convincing evidence is necessary to establish an action for fraud and deceit." *Patrick*, 369 S.E.2d at 164. Virginia courts will reverse verdicts of fraud where such evidence has not been presented. *See id.* at 164–65. The hope that a jury might disbelieve a witness despite the absence of any contradictory evidence is too slender a reed for avoiding summary judgment, especially where, as here, the burden is clear and convincing evidence. Even if a jury were to find that the testimony of Manno and von Berg lacked credibility, no reasonable jury could find that this lack of credibility constituted "clear, cogent, and convincing evidence" of fraud. The evidence, taken in the light most favorable to PIBC, does not amount to "the increased proof the law requires to establish fraud...." *Id.*[59] Counts IV and V should therefore be dismissed.

**57.** Deposition of Lourdes Diestro and Ingrid Morroy, at 190–194. There is a dispute as to whether Diestro also spoke with Frederico Manno. Manno testified that he called Diestro on July 21st to request extension of payment until the following week, before sending her the telex which is in the record. Diestro testified that she only remembered speaking to Ronald Khoshabeh. This disputed fact is irrelevant to the Court's holding. Even accepting Diestro's testimony, the proof offered is not "clear, cogent, and convincing."

**58.** Plaintiff's Memorandum of Points and Authorities Replying to First American's Opposition to Plaintiff's Motion for Partial Summary Judgment and Opposing First American's Cross–Motion for Summary Judgment, filed November 29, 1990, at 7.

**59.** There appears to be a second, fatal flaw in PIBC's fraud claims, though the parties have not adequately briefed it and the Court does not reach it. The elements of fraud include "re-

liance by the party misled" and "resulting damage to the party misled." *Winn v. Aleda Const. Co.*, 315 S.E.2d at 195. PIBC contends that reliance is shown because, during the seven days from July 21 to July 28, 1989, it merely continued "to hound FABV for payment ... rather than cutting off discussions and calling counsel to resolve the matter." Plaintiff's Memorandum at 8. However, the writ of attachment had already been issued on July 20th, although a copy of it allegedly reached Manno only on the 28th, and it was apparently not served until August 1, 1989. Assuming that PIBC could prove that Manno deceitfully failed to inform PIBC of the attachment, though he knew of it, until a copy of it crossed his desk on July 28th, it is not clear that PIBC would have had any legal recourse different from that available to it on July 28th when it was informed of the existence of the attachment order. PIBC has pointed to no authority indicating that it could have enjoined service of the writ of attachment. Nor does it appear that PIBC could have obtained an injunction requiring First American to pay PIBC

■ PIBC contends in Count VII of its Complaint that First American breached the implied duty of good faith imposed on contracting parties by Virginia Code § 8.1–203. This Count is based in part on the same allegations as the fraud counts. PIBC alleges that First American dealt fraudulently with it by reaching an agreement with Dameron to stall PIBC while a writ of attachment was obtained and served. As noted above, however, PIBC has not produced sufficient evidence to show fraud. PIBC further contends that First American had a duty to disclose to PIBC the following: (1) that Dameron and the Pitts had insufficient funds in accounts with First American to cover the draws under the Letters, (2) that each of the extensions requested had been the subject of discussion between First American and Dameron, and (3) that in telephone conversations Richard Pitts told First American officials that he intended to make sure that payment did not occur and to pursue all options available for that purpose. *See* Complaint at ¶ 108. This contention is unsupported by precedent or principle.[60] " 'Good faith' ... means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Va.Code § 8.2–103. PIBC has produced insufficient evidence of fraud and no evidence of a breach of "reasonable commercial standards of fair dealing" other than the breach of contract found in Part I. PIBC will be fully compensated for that breach, as discussed in Part I.

## V. *PIBC's Claim of Conspiracy to Injure Its Business*

■ PIBC alleges in Count VI of its Complaint that First American, Dameron and Richard Pitts conspired to injure PIBC in its business, in violation of Virginia Code § 18.2–499, by agreeing to stall payment to PIBC until Dameron had obtained and had served the writ of attachment. Even assuming that the allegations were true, this would not amount to a violation of § 18.2–499.

Section 18.2–499(a) makes it unlawful for two or more persons to combine together "for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession...." Violators are "guilty of a Class 3 misdemeanor." *Id.* In addition, a plaintiff so injured may recover treble damages, the costs of suit, and reasonable attorney's fees. Va.Code §§ 18.2–499(a), 18.2–500(a). For conduct to fall within the scope of § 18.2–499, it "must be directly aimed toward damaging the business, trade, reputation or profession: The injury must not be a result or secondary effect of an action taken for mere personal gain." *Nationwide Mutual Fire Ins. Co. v. Jones,* 577 F.Supp. 968, 970 (W.D.Va. 1984); *accord In re Landbank Equity Corp.,* 66 B.R. 949, 963–64 (Bankr.E.D.Va. 1986), *aff'd in part, remanded in part,* 83 B.R. 362 (E.D.Va.1987); *see Greenspan v. Osheroff,* 232 Va. 388, 351 S.E.2d 28, 35–36 (1986). PIBC's allegations do not meet this test. At most, they amount to a claim that First American, Dameron, and Richard Pitts fraudulently conspired to cause PIBC to rest on its legal rights while Dameron obtained and served the writ of attachment. Such a conspiracy, even if true, was manifestly for the purpose of protecting the parties from the loss of $95,904, not for the purpose of injuring PIBC's business. Any injury to PIBC was a "secondary" or "consequential" result of the parties' attempt to protect themselves. As such, the allegations fail to state a § 18.2–499 claim for that section is "inapplicable to one iso-

before service of the writ; any damages from nonpayment were entirely monetary and hence not irreparable. Hence, there appears to be no damage from the deception alleged.

60. PIBC cited no relevant cases recognizing such a duty of disclosure and none have been found. Moreover, it seems implausible that a confirming bank could be injured by failure to disclose information about an account customer's assets. Whether or not the account custom-er has sufficient deposits with the issuing bank, the issuing bank is contractually bound to honor a letter of credit at the date of maturity. Furthermore, it seems contrary to the policies underlying letters of credit to hold that an issuing bank must immediately alert confirming banks of threatened injunctions so that the latter may thwart the attempts of account parties, and of the courts, to attach payment in those limited circumstances where a court finds attachment to be warranted.

lated incident in which a combination of persons defraud a company for their own personal enrichment." *Nationwide Mutual Fire Ins. Co.,* 577 F.Supp. at 970–71; *accord In re Landbank Equity Corp.,* 66 B.R. at 964.

### Conclusion

To sum up, summary judgment in favor of PIBC, the confirming bank, is granted as to Count I—PIBC's claim of wrongful dishonor against First American, the issuing bank. Summary judgment in favor of First American is granted on its cross-claim for reimbursement against Dameron and the Pitts, *i.e.,* the account customer. Judgment will be entered for PIBC against First American, and for First American against Dameron and the Pitts, for the amount of the draws under the Letters plus interest. Counts II and IV–VII and the cross-claim of Dameron and Richard E. Pitts against First American will be dismissed with prejudice. An appropriate order has issued.